IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| JESSIE L. LYKES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CIVIL ACTION NO. 97-RRA-1849-M |
| ) | |
| LEGGETT & PLATT, INC., d/b/a ) | |
| CULP ALUMINUM ALLOYS, ) | |
| ) | **ENTERED** |
| Defendant. ) | |
| | OCT 1 3 2000 |

## MEMORANDUM OPINION

The plaintiff is a black man who alleges that he was the victim of race discrimination at work. Claim One of the complaint asserts Title VII violations in several terms and conditions of employment, including compensation, promotion, and, finally, termination of employment. Claim Two asserts a claim of "interference of contractual rights because of race," which alleges that the defendant had a policy and custom of discriminating against black persons in violation of 42 U.S.C. § 1981 et. seq., and 42 U.S.C. § 1981a, et seq. The defendant filed a motion for summary judgment as to all claims, and has filed a brief in support thereof. The plaintiff filed an opposing brief, to which the defendant filed a reply.[1]

---

[1]The court granted the plaintiff's motion to strike the Robinson affidavit, while the defendant's motion to strike the Beaird affidavit was denied.



## Summary Judgment Standard

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P.56. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be `no genuine issue as to any

> material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett v. Parker*, 898 F.2d at 1532 (citation omitted). "Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co.*, 420 F.2d at 1213. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Impossible Electronic [Techniques, Inc. v. Wackenhut Protective Systems, Inc.*], 669 F.2d [1026] at 1031 [(5th Cir.1982)]; *Croley v. Matson Navigation Co.*, 434 F.2d 73, 75 (5th Cir.1970)." *Treister v. City of Miami*, 893 F. Supp. 1057, 1059 (S.D. Fla. 1992).

## Termination Claim

When the plaintiff began working for the defendant he signed an acknowledgment that he had read and understood the defendant's substance abuse policy. It stated:

> The abuse of drugs and alcohol can cause a serious threat to a safe and productive work environment. It is our policy that the use, negotiation for, possession, sale, or working while possibly under the influence of illegal drugs or alcohol on the job or on Company property is strictly prohibited. *Employees who are found to have unacceptable levels of drugs or alcohol in their systems through a medical screening will be considered to be in violation of this policy.* The abuse or improper use of prescription or over the counter drugs is also prohibited. *Employees who violate this policy will be subject to immediate and*

> *severe disciplinary action up to and including termination of employment for the first offense.*

*Plaintiff's Exhibit 5 to Deposition of Thomas Battles.* (Emphases added).

On November 20, 1995, the plaintiff was to work the second shift, from 3:00 p.m. to 11:00 p.m. The plaintiff called his supervisor and said that he would be late because he had to provide transportation for his mother-in-law. On arriving at work around 5:00 p.m., the plaintiff talked to Ms. Elders, the Human Resources Director. Elders thought she detected alcohol on the plaintiff's breath. She also noticed that the plaintiff was behaving differently, as he was "rather vocal," "acting very serious, and loud," instead of being "upbeat and joking around." *Elders Deposition,* pp. 20-21. After the plaintiff left, Elders asked Ms. McClendon, the Controller/Manager, if she had smelled alcohol when the plaintiff passed her in the hallway. McClendon replied that she had. Mr. Hughes, the plaintiff's immediate supervisor, smelled alcohol on the plaintiff as well. Hughes asked Mr. Washburn, the plaintiff's former immediate supervisor, to bring a test consent form and come to his office. In Hughes' office, Washburn detected a strong odor of alcohol when he got close to the plaintiff. The plaintiff refused to sign the consent form until he spoke with Mr. Battles, Plant Manager. In his office, Battles met with Mr. Surrett, Assistant Plant Superintendent, Ms. Serviss, Safety and Risk Management Director, and Washburn. Serviss smelled alcohol on the plaintiff, as did Battles. Serviss also noticed that the plaintiff's eyes

were bloodshot and that he seemed uncharacteristically agitated and nervous. The plaintiff admitted that he had drunk two or three beers that morning.[2] The plaintiff signed the consent form and Surrett took him to the emergency room at Gadsden Regional Medical Center. Serviss also went to the hospital.

After a wait of several hours, samples were taken. Serviss overheard the nurse tell the plaintiff that he was not legally drunk at that time. The actual results of the final alcohol serum report were "negative." Because, however, several hours had passed from the time the plaintiff reported to work and the time the samples were obtained, Serviss contacted a Dr. Foster at the medical center, and requested information concerning the rate at which the body metabolizes --- absorbs --- alcohol. Dr. Foster sent an excerpt from a medical treatise, which stated that the body processes alcohol at the rate of .015 mg/ml per hour. Serviss then calculated that the plaintiff's blood alcohol content when he appeared for work was "well in excess of the level shown on the final alcohol serum report [at] the time he reported to work on November 20th." *Defendant's Brief,* p. 11. Then Battles, Elders, Serviss, and the defendant's corporate human resources department determined that the plaintiff had an "unacceptable level" of alcohol in his system when he reported to work at 5:00 on November 20, 1995. Following that determination, the plaintiff met with Battles,

---

[2]Serviss stated in her affidavit that she overheard the plaintiff tell an emergency room nurse that he had drunk four or five beers that day.

Elders, Serviss, Hughes, and Steapleton, the Plant Superintendent, at which time the plaintiff was told that he had appeared for work with an unacceptable level of alcohol in his system and that the decision had been made to terminate his employment.

During the course of her deposition, Elders was questioned as to how the defendant determines whether a level of blood alcohol is or is not "acceptable:"

> Q.    . . . . What I'm trying to ask is: Is there a method, is there a policy, is there a practice that's implemented by you or anybody else at Culp with regards to deciding what's acceptable or unacceptable in terms of the level of drugs and alcohol in an employee's system?
> . . . .
>
> A.    I would say, no, there's not a policy.
>
> Q.    Okay.
>
> A.    I mean, this is our policy, the substance abuse policy.
>
> . . . .
>
> Q.    So in deciding whether or not an employee has violated or not violated this policy, there's no method or practice that you follow in making that determination?
>
> A.    Well, I would say there is. I mean, we take everything into consideration as far as what their - - - as far as their drug screen goes or alcohol screen whatever, and then make a decision after that.
>
> Q.    In this case, what did you take into consideration?
>
> A.    I think a major thing was the fact that they waited so long to test Mr. Lykes once he was taken to the hospital.
>
> Q.    And do you know what caused that delay?
>
> A.    No, I do not.

> Q.     Do you know if Mr. Lykes caused that delay?
>
> A.     I have no idea.
>
> Q.     What else, if anything?
>
> A.     *I would think that was - - like I said, that was the major thing: He had alcohol in his system on the results that we got, and that was unacceptable.*
>
> Q.     Who decided that it was unacceptable?
>
> A.     I support, there again, a joint decision with our corporate office and Mr. Pine, Mr. Battles, and myself, and Ms. Serviss.

*Deposition of Lisa Elders,* pp. 32-34. (Emphasis added)

The plaintiff must establish a prima facie case that his employment was terminated because he is a black man. He can establish a prima facie case through either circumstantial or direct evidence of discriminatory intent. *Smith v. Horner*, 839 F.2d 1530, 1536 (11th Cir. 1988). In *Caban-Wheeler v. Elsea*, 904 F.2d 1549 (11th Cir. 1990), the Eleventh Circuit stated a test to assist in making the sometimes difficult determination of whether there is direct evidence of discrimination:

> Although the question of whether a plaintiff has presented direct evidence is not always entirely clear, direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee. *See Hill v. Metropolitan Atlanta Rapid Transit Authority*, 841 F.2d 1533, 1539 (11th Cir.1988); *Thompkins v. Morris Brown College*, 752 F.2d 558, 563 (11th Cir.1985); *Dunning v. National Industries, Inc.*, 720 F.Supp. at 929 n. 6.

*Id.* at 1555. In *Caban-Wheeler v. Elsea,* the plaintiff was a white Hispanic female who claimed that she was terminated in order to give her job to a black person. The court

-7-

held that the statement that a certain program needed a black director constituted direct evidence of discrimination. The court in *Earley v. Champion International Corporation*, 907 F.2d 1077 (11th Cir. 1990) stated the direct evidence test another way, and also gave an example:

> "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact [in issue] without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir.1989) (emphasis added); accord *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1558 n. 13 (11th Cir.1988); *Rollins*, 833 F.2d at 1528 n. 6. "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, ... constitute direct evidence of discrimination." *Carter*, 870 F.2d at 582. One example of direct evidence would be a management memorandum saying, "Fire Farley--he is too old." But the evidence at issue here, at most, suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence; by definition then, the evidence is circumstantial. *Rollins*, 833 F.2d at 1529.

*Id.* at 1081-82. On the other hand, statements, even statements made by decision-makers, which merely *suggest* a discriminatory motive, are by definition circumstantial evidence. *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 961 (11th Cir. 1997) ("These statements . . . however inappropriate they may be are not direct evidence of a discriminatory motive with respect to the appellate's claims of failure to promote . . . .")[3]

---

[3]Circumstantial evidence of discrimination does not require the defendant to shoulder an additional burden of proof. *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 961 (11th Cir. 1997). On the other hand, when "direct evidence" statements are attributable to the decision-maker, the trier of fact "accepts the ultimate issue of discrimination as proved." *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir.), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984). When there is direct evidence of discriminatory motive, "the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the [illegitimate criterion] into account." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989). *Caban-Wheeler* states the *McDonnell Douglas* prima facie case of disparate treatment, and explains the effect of direct evidence of discriminatory motive on the

In the case at bar, the only statements which merit discussion as to whether they constitute direct evidence are those of Battles and Washburn, who were both present at the meeting where it was decided to terminate the plaintiff's employment.[4] Those statements come to the court in the form of Carol Beaird's affidavit. She states:

> My name is Carol Beaird. I was a former purchasing clerk for Leggett & Platt, Inc. d/b/a Culp Aluminum Alloys from February of 1991 through May of 1996. My office was part of the office building where other managers and office person[nel] had their offices. In the fall of 1995, several weeks before Jessie Lykes was terminated by Culp Al[uminum] Alloys, Mr. Thomas Battles, plant manager, and several plant supervisors met in my office. I heard that they were talking about Jessie Lykes and I heard Mr. Battles say, regarding Jessie Lykes, "I want his black ass out of here." This was before the incident involving Mr. Lykes being tested for alcohol and drugs. With regards to Culp supervisor Wes Washburn I heard Mr. Washburn refer to a black employee as a "nigger" sometime in 1993-1994. It took place in the hall where the time clock is located at Culp in Steele.
> I recall a conversation in 1994 where Mr. Thomas Battles told another supervisor, "that if they didn't put a lid on Wesley Washburn and the niggers they were going to face a lawsuit." I understood this to mean that Mr. Washburn was treating the black employees adversely.
> With regards to Culp supervisor Johnny Hughes, I recall him referring to a black employee as a "black ass bastard." I also recall Mr. Hughes frequently using the term "nigger" referring to the black employees of Culp.
> Mr. Battles told me directly that he hates depositions and that he would

---

*McDonnell Douglas* prima facie framework, particularly the distinction between the burden of production and the burden of persuasion and the shifting of burdens from one party to the other. *Caban-Wheeler v. Elsea*, 904 F.2d at 1554-1555.

[4]Washburn was not at the meeting where the plaintiff's employment status was discussed, and, from all that appears, Washburn had nothing to do with the plaintiff's termination.

lie if he had to.

It is opined that neither Battles' statement nor Hughes' statement, though both are condemnable, if they were in fact said, constitutes direct evidence of discrimination. Racial epithets do not constitute direct evidence of discrimination per se. Although Hughes used a racially derogatory term, he did not say that he did not want a black person to have the plaintiff's job. Even though Battles said he wanted the plaintiff's "black ass *out of here*," he did not say that he wanted the plaintiff, who is black, out of the job *because* he is black.

It will now be considered whether there is sufficient circumstantial evidence to defeat the defendant's motion for summary judgment, using the familiar *McDonnell Douglas* framework. One way to establish a prima facie showing of discriminatory termination is set out in *Coutu v. Martin County Board of Commissioners*, 47 F.3d 1068 (11th Cir. 1995):

> In order to prove discriminatory treatment in violation of Title VII, a plaintiff must first establish a prima facie case of discrimination. Absent direct evidence of discrimination, a plaintiff in a termination case establishes a prima facie case by showing (1) that she is a member of a protected class, (2) that she was qualified for the position held, (3) that she was terminated, and (4) that she was replaced by a person outside the protected class.

*Id.* at 1073.⁵ The defendant states in its original brief, which statement is not disputed by the plaintiff, that, according to the affidavit of Darnell Bender, the defendant's Human Resources Representative, the plaintiff's job was awarded to another black person, Ottrix, on March 28, 1996. Therefore, the plaintiff cannot establish the last element under the *Coutu* test. As the plaintiff points out, however, there is another way to make a prima facie showing of discriminatory discharge under *McDonnell Douglas*. This alternative framework has a fourth element different from that stated in *Coutu*.

> [A plaintiff may show] that he was discharged for misconduct which was nearly identical to that engaged in by one outside of the protected class whom the employer retained. If disciplinary rules are applied discriminatorily, it is unnecessary to show that plaintiff was replaced by a nonminority.

*Hawkins v. Ceco Corporation*, 883 F.2d 977, 984 (11th Cir. 1989)( citations omitted). The question in this case, then, is whether the summary judgment evidence can support a finding that the defendant's application of its substance abuse rules was discriminatorily applied to this plaintiff.

The plaintiff points to the affidavit of Bobby Ansley, which states:

> My name is Bobby Ansley. I am currently employed as a forklift operator for Culp Aluminum Alloys. I began with Culp in 1993. I was hired as a general laborer.
> During my employment with Culp I came into contact with a white employee who came to work intoxicated and smelling of alcohol. Daniel Battles, the white employee, came to work at least three times under the influence.

---

⁵The *McDonnell Douglas* analysis is altered only if the plaintiff presents direct evidence of discrimination. *Caban-Wheeler v. Elsea*, 904 F.2d 1549 (11th Cir. 1990).

*Ansley Affidavit, Evidentiary Submissions of the Plaintiff in Opposition to Defendant's Motion for Summary Judgment.* The plaintiff also relies on his own depositional testimony:

> A. Yes, on this alcohol policy. They had a white guy, fifteen years he had service there. They laid him off various times for abusing the alcohol and drug policy, laid him off.
> And they had another white guy they offered him rehabilitation. They sent him to rehabilitation classes or something or another like that, you know.
>
> Q. What are their names?
>
> A. Daniel Battles and Stephen -- Daniel and Stephen.
>
> Q. Okay, and when did this happen? When did these two situations occur?
>
> A. Daniel was terminated in -- eventually they terminated him in '93. Stephen, he was still working after I was terminated.
>
> Q. Okay.
>
> A. He was in rehab when I was terminated.
>
> Q. Do you know if they ever failed a drug or alcohol screen?
>
> A. Yeah. Well, Stephen, because he went and -- I can't remember what day they took him to take the test, because he was surrendered to drug testing for a year or so.
>
> Q. Isn't it true the policy at Culp is if an employee comes forward and admits a substance abuse problem that the company will give them assistance if they come forward and ask for it before they get caught in a drug screen?
>
> MR. MILES: Object to the form.
>
> A. Yeah, that's correct.
>
> Q. Do you know if that's what happened in those situation?
>
> MR. MILES: Object to the form. Answer if you know.

A.      Yes, yes, I do know. No didn't neither one of them didn't go forward and admit they had a drug problem.

Q.      They tested positive in a drug screen before -- and how do you know that?

A.      Well, Stephen, he works with me. Someone else reported him. And they gave him an option either to go and to through with the program or else they would fire him. So he agreed to go through the program.

Q.      Who reported him?

A.      They didn't give no names. It was a -- they didn't give no name of who report him.

Q.      And you got this information from Stephen?

A.      Yes, yes, from Stephen.

Q.      What is Stephen's last name again?

A.      I can't recall his last name.

Q.      Okay. And the other person you mentioned, what was his name?

A.      Daniel.

Q.      What was his last name?

A.      Battles.

Q.      Battles. Is he related to Thomas somehow?

A.      I don't know.

Q.      Okay. And do you know whether he got caught in a drug screen, or did he come forward and ask for help?

A.      I don't think he ever even took one.

Q.      Okay.

> A. I know the time I started they laid him off for coming in drinking.
>
> Q. Okay. Before you started work?
>
> A. No, when I was working there.

*Plaintiff's Deposition*, pp. 113-17. The defendant, however, points to the affidavit of Bender, their Human Resources Representative. He states:

> I have consulted with Thomas Battles concerning employees who have had issues arise under Culp Aluminum's substance abuse policy in the 1990's at the facility in Steele, Alabama, and have reviewed the personnel files of those employees. The following employees have had issues arise under the substance abuse policy:
>
> | | | |
> |---|---|---|
> | Daniel Battles | W | 3/24/94 |
> | Mitch Lawder | W | 2/10/95 |
> | Roderick Adams | B | 2/16/95 |
> | Jessie Lykes | B | 11/20/95 |
> | David Walker | W | 6/6/96 |
> | Brian Taylor | B | 1/13/97 |
> | Gary Menninger | W | 2/11/98 |
>
> Attached as Exhibit E are true and correct copies of personnel records pertaining to the manner in which these violations were handled. Daniel Battles, Mitch Lawder, Roderick Adams, Jessie Lykes and David Walker had positive drug or alcohol test results and were terminated on the first violation. Brian Taylor and Gary Menninger came forward voluntarily and requested assistance before being caught in violation of the policy. These two employees were allowed to enter substance abuse treatment programs and return to their jobs subject to periodic random testing. To my knowledge, no other employees were ever suspected of substance abuse violations or came forward voluntarily other than those employees discussed above.

The defendant correctly points out that Ansley does not state, as required by law, that a supervisor knew that Daniel Battles came to work intoxicated. *See Connor v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1502 n.6 (11th Cir. 1985). The plaintiff states

in his deposition, though, that Daniel Battles was actually laid off various times for violating the defendant's substance abuse policy, and that he was finally terminated in 1993. The plaintiff fails, though, to state the source of his knowledge, and thus his testimony on this point cannot be credited, while the defendant's records show that Battles was terminated for one violation.[6] As to the other white employee whom the plaintiff testified came to work in violation of the defendant's substance abuse policy and who was not dismissed, the plaintiff identified him only as "Stephen," while Bender's list of persons who had substance abuse "issues" does not contain anyone named Stephen. Also, the plaintiff's testimony concerning Stephen is inadmissible hearsay.

Even if it were assumed that Battles' employment was not terminated after one violation, and that Battles had not reported himself to a company official, it is opined that such would have been an isolated incident and could not support a finding that the plaintiff was dismissed because he was black. The defendant's records show that seven persons had substance abuse issues. Five of them were dismissed for first-time violations. Of those five, three were white and two were black, including the plaintiff. Of the two employees who were allowed to return to their jobs after treatment, one was black and one was white.

---

[6]If Battles had been laid off for treatment, that would have been consistent with company policy, but Bender's affidavit does not state that Battles was one of the employees who received treatment and then returned to the job.

It is concluded that the plaintiff has not made a prima facie case of discrimination by showing that white employees who violated the defendant's substance abuse policy were treated differently from the plaintiff.

### Compensation and Promotion Discrimination Claims

Bender's affidavit apparently refutes the plaintiff's allegations concerning compensation and promotion discrimination. The plaintiff did not address these issues in its brief in opposition to the defendant's motion for summary judgment, and therefore the defendant's evidence and argument as to the plaintiff's allegations of compensation and promotion discrimination allegations stand unrefuted. Also, these claims can be considered abandoned by the plaintiff. *See Road Sprinkler Fitters Local Union # 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563 (11th Cir. 1994). Thus, the defendant is due summary judgment on the compensation and promotion discrimination claims.[7]

---

[7]The allegations that black workers had to work under extended probationary periods, but not whites, and that whites were allowed to take heat breaks, but not blacks, are no longer issues in this case. See the Order entered July 8, 1998.

## Conclusion

Wherefore, the defendant's motion for summary judgment is due to be granted as to all claims, and the complaint is due to be dismissed. An order in accordance with this memorandum opinion will be entered.

DONE this 12Th day of October, 2000.

Robert R. Armstrong, Jr.
United States Magistrate Judge